UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-22659-Civ-MOORE

FABIO OCHOA-VASQUEZ,
    Movant,

v.

UNITED STATES OF AMERICA,
    Respondent.
_____/

**MOVANT'S RESPONSE TO SUPPLEMENTAL MEMORANDUM
CONCERNING MOTION TO VACATE CONVICTION**

    Movant Fabio Ochoa-Vasquez, through counsel, hereby responds to the government's supplemental memorandum of law and accompanying exhibits concerning the motion to vacate conviction and sentence under 28 U.S.C. § 2255, and states:

    1.    On September 18, 2014, the government filed a supplemental memorandum of law (DE:169) and accompanying exhibits concerning the movant's 28 U.S.C. § 2255 motion. As exhibits, the government filed a one-page affidavit by attorney Joaquin Perez (169-1) and a two-page affidavit by AUSA Edward Ryan of the Western District of North Carolina (169-2). The memorandum constitutes the government's only substantive response to the conflict-of-interest claims raised by the movant, the government having previously asserted merely that the claims were already resolved in a prior appeal. The Eleventh Circuit rejected the government's procedural argument and remanded for merits consideration of the conflict-of-interest claims. For the reasons stated in his initial and amended 28 U.S.C. § 2255 motions, and those outlined in this response, the Court should proceed to grant an

evidentiary hearing and allow limited discovery on the claims.

2.      In its supplemental memorandum, the government presents a series of arguments as to the conflicts of interest by attorney Joaquin Perez (herein "Perez"), including that: Perez did not formally serve as counsel to government witness Hector Londono; that because subsequent to Perez's conflicted representation of the movant, other lawyers represented the movant, Perez's adverse impact was cured; that Perez's representation of Nicholas Bergonzoli cannot be considered with regard to prejudice to the movant at trial, because Bergonzoli did not testify; that because the movant, after his extradition, received plea offers requiring a sentence of at least 20 years, his decision to proceed to trial cannot be attributed to actions of Perez in the period before extradition; that plea negotiations following indictment and while a defendant awaits extradition do not constitute a critical stage during which a defendant has a constitutional right to effective assistance; that "overwhelming evidence" of guilt defeats the movant's claims of trial prejudice; and that Perez's client Bergonzoli did not have interests that were adverse to the movant.

3.      None of the government's arguments have merit. The government rests these claims primarily on limited assertions by Perez concerning *direct* interactions with Londono and his dispute of being involved in the Bergonzoli and Baruch Vega effort to work with Perez to obtain a multi-million-dollar payment from the movant as a precondition for a plea agreement. The Ryan affidavit adds little to the government's argument because it deals only with 20- and 25-year-sentence plea offers made to attorneys who represented the movant post-extradition; the Ryan affidavit does not purport to corroborate any claim by Perez. That the government rests its merits response on the one-page Perez affidavit – albeit with a rote

2

adoption of a pleading filed on Perez's behalf that concedes Perez represented Bergonzoli for years, No. 99-6153-Cr-KMM, DE:1087 – merely invites discovery and an evidentiary hearing. Partial denials and incomplete revelations do not resolve the case.

4. In his affidavit, Perez notably does not dispute that he was *retained* as counsel for Hector Londono (and was paid for that representation) while Londono was incarcerated in Colombia. Instead, the Perez affidavit states merely that Perez's *direct* contact with Londono was limited. The affidavit states that Perez does not "recall" further conversations with Londono after meeting with him in a Colombian jail, but does not state: what other actions Perez took on behalf of Londono; who paid for the representation of Londono (i.e., Bergonzoli); whether Perez was in contact with Londono's family and associates (including specifically Londono's wife, Bergonzoli, and Londono's Colombian attorney Jorge Perez, who is prepared to verify that Perez was hired as Londono's counsel) before and after direct contact with Londono; and whether Perez coordinated his efforts in Londono's case with his client Bergonzoli, including cooperation Londono admitted was ongoing.

5. In summary, the Perez affidavit reflects an attempt to limit the scope of information conveyed regarding Perez's representation of Londono, by focusing on questions the government declares as most important: *direct* contact with Londono, as opposed to *indirect* contact through Londono's wife, who attended the Panama meetings with Vega, Bergonzoli, and DEA agents before Perez's trip to Colombia to meet with Londono; and formal representation of Londono in court, as opposed to providing and coordinating advice to Londono regarding the Bergonzoli-led cooperation efforts that adhered to the Baruch Vega

"program" of payment for access to DEA dealmakers.

6.  The government describes Perez's meeting with Londono at La Picota jail in Colombia as if it were akin to bumping into someone on the street. But such a meeting required advance planning, approval, substantial payment, and coordination. And it is not unusual for there to be few in-person meetings with an American lawyer and an incarcerated Colombian client. Jail records at La Picota show the approval given to Perez for his visit with Londono that *preceded* his meeting with the movant.

7.  The terse Perez affidavit, following up on the terse 2003 pleading filed on Perez's behalf as part of a motion to intervene in opposition to the movant's efforts to utilize Bergonzoli as a witness (No. 99-6153, DE:1087), merely illustrates the difference between a monologue and the taking of evidence on a crucial point. Perez's representation of Londono in the period in which he promoted improper and illegitimate plea offers to the movant and Perez's representation of Bergonzoli and his participation in discussions supporting Bergonzoli's promotion of the extortionate Vega plan for the movant's plea agreement (part of the conduct for which Vega was later charged, in S.D. Fla. No. 1:00-MJ-02467, and which Perez's clients sought to blame on DEA agents, *see* Appendix A, Memo to DEA Agent Vincent Mazilli, addressing Perez conflicts of interest as to Vega "program") raises a significant factual question that warrants discovery and an evidentiary hearing.[1] *See Moore v. Gibson*, 195 F. 3d 1152, 1164-65 (10th Cir. 1999) (where trial record

---

[1] The obstruction of justice and money laundering charges against Vega and codefendant Roman Suarez (for whom counsel were Perez and his officemate Nelson Rodriguez) were dismissed by the government soon after the movant was extradited to the United States in 2001.

does not contravene allegations which, if proved, would warrant habeas relief, district court must permit limited discovery); *Teague v. Scott*, 60 F. 3d 1167, 1172 (5th Cir. 1995) ("Denial of an opportunity for discovery is an abuse of discretion when the discovery is necessary to fully develop the facts of a claim"). Notably, large portions of the record of the prosecutions of Londono, Bergonzoli, and Vega remain sealed. The coordinated efforts of counsel, and specifically Perez, to maintain closure of the activities and timing of the cooperation of these clients continues to hinder the movant's ability to expose how severely he was impacted by exposing the extortion scam.

      8.     Perez's representation extends to the Vega obstruction case, the Bergonzoli drug prosecution, Londono's cooperation against the movant, and other defendants who participated in the Vega program that the movant exposed as an extortion scam. DEA concerns that Perez was manipulating DEA informants to place blame on DEA agents shows that the undermined position in which the movant was placed was not unique to the movant, but was part and parcel of the presentation of the Vega plan as the only way to negotiate a reasonable plea. The thin reed of the Perez affidavit offers the government no protection from inquiry into the real meaning of the undercover tape recordings of Perez and Bergonzoli presenting Vega's $30 million buy-a-deal plan to the movant and his family. The recordings, set forth as exhibits in 99-6153-Cr-KMM, DE:989 (attached hereto as Appendix B), speak for themselves. While Perez sought, in 99-6153-Cr-KMM, DE:1087, to offer caveats to his participation in Bergonzoli's promotion of the extortionate Vega plan offered to the movant, the tapes show that Perez and his clients were moving forward with the Vega plan. And the

fallout from the movant's disclosure of the Vega extortion tactic was to dramatically turn all those who were benefitting from the plan against the movant and to turn a no-witness case against the movant into a four-witness case against the movant that the government now (wrongly) calls overwhelming. Not only did Perez's conflict result in a lost opportunity to negotiate a plea, it also resulted in creating a camp of witnesses against the movant that made regularized negotiation of his case impossible.

9.  The standard for determining whether ineffective assistance of counsel deprives the defendant of the opportunity for a plea resolution that he would have preferred to a trial was explained by the Supreme Court in *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012), and *Missouri v. Frye*, 132 S.Ct. 1399, 1409 (2012). The plea negotiation stage is a critical stage, *id*., and denial of the right to effective assistance in relation to a plea is gauged by its effect on the plea status at the time of the ineffectiveness, not plea offers later made in a case after the defendant's ability to negotiate a deal has been eroded.

10.  Perez's tape-recorded assertions to the movant's family, *see* CRDE:989:425, assuring them that Vega had the DEA connections to fulfill his high-priced promises and related statements by Bergonzoli and Perez showed that Perez was, along with his client Bergonzoli, promoting the Vega financial plan and thereby ruining the movant's real opportunities for legitimate plea bargaining. By resisting the extortion, the movant became a pariah to the cooperators, and a case that had no witnesses against the movant became a multi-witness government case for which plea offers leapt from single digits to 25 years imprisonment. But for the conflicted and improper representation by Perez, there is every

reason to believe that the movant could have received the same type of plea deal that other defendants with major involvement in the case received. The relevant witnesses who can establish these facts, Bergonzoli and Carlos Ramon (who paid the amounts demanded) and Vega (who was prosecuted for the running the plan) are free in the United States and available to testify to the way the plan operated and the revenge reaction to the movant's efforts to expose it.

11.   Attached as Appendix B is a set of exhibits of record in the criminal case, including numerous pages of transcripts of tape recordings reflecting the involvement of Perez in the conflicted position of advancing, along with his client Bergonzoli, plans to adhere to the Vega programs. Also attached, as Appendix C, is a recitation of the facts pertaining to Perez's representation of Bergonzoli and other defendants supporting the Vega financial plan for cooperation. *See* Appendix C (Ochoa Brief, 11th Cir. No. 04-10718) at 5-21.

12.   There is a substantial body of record evidence, that will be supported at a hearing by the testimony of Bergonzoli, Ramon, and Vega, as to the actions of attorney Perez and the disastrous consequences for the movant when he revealed the coordinated efforts of Vega, Bergonzoli, and Perez to promote the Vega plan. Multiple witnesses will confirm at an evidentiary hearing that although he traveled to meet with clients Londono and the movant in Colombia only once, Perez met and conferred with the families of both men and coordinated aspects of their defense via telephone and other communications, including through third parties, such as Bergonzoli. Also available as witnesses are the wife of Hector

Londono, Mr. Londono himself, and other attorneys and family members of the various clients served by Perez's representation.

13.     The overwhelming financial interests of the Vega-Bergonzoli buyout plan and the specific interests of individual clients diverged to such an extent in the case of the movant that the conflict came to the surface and undermined any plea effort by the movant.  Perez – by advancing the interests of some defendants as witnesses against those who failed to pay the extortionate demands made on the Millenium cooperators, and by placing the movant in the position of exposing the extortion and having those whose financial interests he hurt by not buying in to the scheme turn into witnesses against him – acted with an actual conflict of interest that permanently impaired the movant's ability to cooperate, hid the extent of the extortion, aided the witnesses in collaborating against the movant, and ultimately failed to reveal to the government the extent of the corruption involved in the cooperation plan so as to prevent the movant from receiving the same types of deals that were obtained by those who paid, albeit lesser sums than that demanded of the movant.  Absent the conflict of interest, Perez could have negotiated directly with the government at the stage when acceptable plea offers were still being made and when the only "evidence" the government had against the movant was tapes that showed him to be uninvolved in the drug deals, much less involved in anything having to do with the United States.

14.     Notwithstanding the claim of an offer of 25 years imprisonment for the movant conveyed to Jose Quinon – for which the government offers no written documentation, such as an e-mail or letter – no such offer was ever conveyed to the movant.  Regarding the 20-

year offer conveyed to Roy Black, the offer came as the movant was attempting to establish the very claims at issue, and was mired in legal proceedings to simply establish a foundation for resolution of the case. And the offer was so severe that it did not compare with pre-extradition offers.

15. The movant's statement of the claim remains valid and warrants further discovery and an evidentiary hearing. As the movant stated in his amended motion to vacate:

> A. Perez' Simultaneous Representation of Fabio Ochoa and Nicholas Bergonzoli.
>
> 3. Joaquin Perez was retained to represent Movant shortly after Movant's arrest in October of 1999, because the Movant's brothers began to receive visits from Government informant Baruch Vega. Vega insisted that he could offer a deal to the Movant which would result in a substantially lower prison sentence, or no prison sentence, in exchange for millions of dollars.
>
> 4. In an effort to convince Movant's family to engage in Baruch Vega's "program," Joaquin Perez met with Movant's brother, Jorge Ochoa, and his then client, Nicholas Bergonzoli. Bergonzoli, attempted to persuade Movant's brother to have Movant enter into the "program."
>
> 5. Neither the Movant nor his brothers ever agreed to pay the amounts that Baruch Vega or Perez requested in order to cut a deal with AUSA Van Vliet.
>
> 6. Despite the fact that he already represented Bergonzoli, Perez nonetheless undertook the representation of Fabio Ochoa.
>
> 7. When the facts of Perez' representation of Bergonzoli are outlined, the actual nature of the conflict becomes clear. First, the government presented evidence at trial that the Movant was guilty of the charged offense because he had assumed Bernal's debt to Bergonzoli for a seized cocaine shipment (DE1573 at [50]) – although there was no evidence that Movant (who was aware that Bernal had legitimate businesses in Colombia) knew of the nature of the debt. Indeed, there existed strong affirmative evidence that he did not

9

(see Paragraph 13 *infra*). After Bernal managed to pay off $2 million of his $4.8 million debt to Bergonzoli, Bergonzoli suggested that he wanted some of Fabio Ochoa's land and that he would take over Ochoa's land and Bernal would then owe the debt to Ochoa instead of to Bergonzoli (DE1573 at [57]). Bernal testified that in February of 1997 he discussed this idea with Movant, who agreed (DE1573 at [58-59]). Thus, Bergonzoli hatched the land swap deal which ultimately resulted in the Movant's conviction for drug trafficking in this case.

8. At the time that Bergonzoli suggested Movant's involvement in this transaction, Bergonzoli had already been indicted in the District of Connecticut (on October 3, 1995) (DE 987 at 28; DE988-989, #18). On March 12, 1999, a docket entry reflecting that the case was being transferred to the Southern District of Florida showed that Perez had represented Bergonzoli at that time. Thereafter, Bergonzoli surrendered in Miami on December 12, 1998, and was released on a $150,000 personal surety bond directly into the custody of Agents Tinsley and Castillo who were involved in the Baruch Vega "program," formally referred to as the "Resocialization of the Colombian Drug Traffickers" (DE1473 at 26; Exhibit 5, DE987 at 52; DE988-989, #28). Bergonzoli admitted in an affidavit that he was cooperating with the government (DE 1473 at 29; #7). During hearings held between March 15-17, 2004, before the Merit Systems Protection Board on the conduct of DEA Agent David Tinsley, this program was openly discussed. Agent Tinsley further testified that even though Movant was a target from the beginning of Operation Millennium, which started in early 1999, his group actually pre-dated Operation Millennium by one and a half to two years during which the Movant was also targeted (DE 111; DE 349 at 44-49, 161).

9. Perez acknowledged that he discussed a $30 million deal for Ochoa's surrender with government informant Baruch Vega (DE987 at 60; DE988-989: #32, p.17). On January 29, 2000, in a meeting between Perez, Jorge Ochoa (the Movant's brother) and Nicholas Bergonzoli at Bergonzoli's ranch in Colombia, Bergonzoli promoted Vega's offer, bragging that he had already spent a bundle to join "the Program" which involved only phony cooperation. *Id*. Perez was present at this meeting but did not cure the misrepresentation made by Bergonzoli as to the cooperation being phony. Nor did he deny Bergonzoli's claim that he had to pay a substantial amount of money to join "the Program." It is clear from Bergonzoli's own affidavit later on that his cooperation contemplated "having a group surrender of the highest-level drug traffickers in Colombia to U.S. authorities" (DE1473 at 30; #7).

10

10. Fabio Ochoa refused to pay Baruch Vega $30 million. The government relied heavily upon evidence of the "land swap deal" to convict Movant (DE1573 at [57-59]). Movant made several efforts to unseal information relating to Bergonzoli's cooperation with the government in an attempt to explore an extortion defense or to decide whether or not to call Bergonzoli as a witness. All of these efforts were vehemently opposed by Joaquin Perez to Ochoa's detriment and in direct and actual conflict with his former representation of Fabio Ochoa.

11. First, Perez moved to quash a subpoena ad testificandum issued for Bergonzoli (DE1054, 1341). Second, Perez opposed an Emergency Motion to unseal the entire Bergonzoli file (DE1473 at 24, #1, #2). Perez argued in his response opposing the Emergency Motion that the motion should be denied in order to protect "higher values" and the confidentiality of Bergonzoli's cooperation, and he accused his former client, Fabio Ochoa, of using the Emergency motion as a "ploy" and "subterfuge" to harm Bergonzoli (DE 1473 at 25, #2, p.2). The court, persuaded by Perez' argument that "denial of access is necessary to preserve higher values," only permitted a small portion of the file to be disclosed to defense counsel (DE1473 at 26, #4). As a result of receiving this scant information, the defense requested a continuance and this request was denied (DE1473 at 28). The defense elected to not call Bergonzoli as a witness due to the lack of information regarding Bergonzoli's case, his cooperation, and the behavior of his attorney.

12. Subsequent to the Movant's conviction and sentence, Judge Patricia Seitz granted a motion to unseal Bergonzoli's February 10, 2000, plea colloquy (DE1637 at 8, #3). The transcript revealed that Bergonzoli had been actively cooperating with agents since his surrender in 1998 and possibly even before then. *Id*. Additionally, Agent Tinsley testified that Bergonzoli had produced extraordinary results for the DEA in his cooperation and had provided information about "corruption matters and leaks within foreign governments and related very delicate political issues," including "leaks within our embassy, of the United States embassy in Colombia where gorilla [sic] factions, communist factions as well as narcotics traffickers." *Id*. at 5-6; 7. [FN 19]

> [FN 19: In his Motion for New Trial Based on Newly Discovered Evidence, the Movant argued that "by information and belief, the "leak" within the U.S. Embassy was a relative of General Serrano the individual about whom the government refused to provide any discovery pretrial" (DE1637 at 10-11).]

  13. Had defense counsel had this copy of Bergonzoli's plea colloquy, which showed no negative information against the Movant, the defense could have called Bergonzoli as a witness to testify to his tape recorded statements in Joaquin Perez' company in which he indicated that he knew Ochoa was innocent. (DE987 at 62-63; DE 988-989: #33, p.10). This viable defense strategy was abandoned as a result of the efforts expended by Joaquin Perez in litigating against his former client. The testimony would have been instrumental to the case because Bergonzoli's confirmation of the Movant's innocence – or the ability to damage his credibility by showing his co-operation with the government – would have powerfully assisted ... in rebutting the government's case. As it was, Movant was unable to present effectively to the jury his contention that, although the land swap transaction indeed took place, it did not from his perspective have any connection to drug-dealing.

  14. Furthermore, the Movant was substantially prejudiced by Perez's actual conflict at the stage when Bergonzoli was promoting Vega's extortion of the defendant. The government disavowed knowledge of Vega's efforts to extort the Movant. However, because Perez had a duty of loyalty to Bergonzoli and his cooperation efforts, he did not pursue a legitimate plea bargain with the United States. In *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978), the Supreme Court recognized that a conflict of interest stemming from multiple representation may prevent an attorney "from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution."

  15. In the instant case, the Movant can even show actual prejudice (which is not necessary) because the government was clearly open to a plea agreement with the Movant. During a pre-trial evidentiary hearing, AUSA Van Vliet read into the record a letter she wrote Perez after March 1, 2000, in which she addressed the possibility of a "global plea agreement" for the Movant and explained that it would be in his client's best interests to seek a global plea agreement (DE1141 at 28-29). She specified that after speaking to other prosecutors with cases pending against the Movant, she could represent that this possibility was not foreclosed (*Id*.). Van Vliet even admitted to writing a note on the back of her business card for Perez to take to Movant's brother Jorge in Colombia in reference to Fabio Ochoa's case (DE1141 at 56-57). The card read: "Jorge, feel free to call me. Theresa." *Id*. Thus, a plea offer was in the making and Movant's plea and cooperation were very real possibilities. However, Perez ruined Movant's chances to accomplish this goal by helping his other client attach an unlawful $30 million kick back to any

agreement between the Movant and the government: a kick back of which the government denied any knowledge (DE 1132 at 77). Perez placed Movant in a Catch-22 scenario, whereby he either paid $30 million or more to receive a "deal" from the government or he fought the charges. This representation was ineffective, was wrought by an actual conflict of interest and divided loyalties to Bergonzoli, (who was trying to achieve the lowest sentence possible); it was prejudicial to the Movant because Van Vliet was open to the possibility of a global plea agreement without Movant paying any money; and it had a substantial prejudicial effect for the Movant who would have agreed to a global plea. There is no greater indicator of this than the Movant and his family's several meetings with extortioners in which the Movant clearly entertained these offers. Although in the end he refused to cooperate with the government and plead guilty, this was solely based on the outlandish price tag supposedly attached to the offer. Thus, Perez' ineffectiveness was in not attempting to obtain a legitimate plea bargain for the Movant in order to help his client Bergonzoli get cooperation credit with the government for Fabio Ochoa's surrender and cooperation. As the Supreme Court noted in *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978), "[i]n a case of joint representation of conflicting interest the evil - it bears repeating - is in what the advocate finds himself compelled to refrain from doing . . . ."

 B. Perez' Simultaneous Representation of Fabio Ochoa and Hector Mario Londono.

 16. Joaquin Perez also provided ineffective assistance of counsel when he simultaneously represented the Movant and Hector Londono. That representation was barred, from its inception, by both Rule 4-1.7 and 4-1.9 of the Rules Regulating the Florida Bar because the interests of Londono and Movant were already "directly" and "materially" adverse. ... In pertinent part, Rule 4-1.7(a) provides that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to the interests of another client, unless . . . each client consents after consultation."

 17. Joaquin Perez was retained to represent Movant while Movant was still incarcerated in Colombia. Both Hector Londono and Movant were arrested on October 13, 1999, pursuant to the Operation Millennium arrests in this case. They were subsequently incarcerated at the same Colombian prison (DE1578 at 30). While incarcerated there, Londono was visited by attorney Perez (*Id*.). Londono consulted Perez and Perez advised him, "what you have to do is to see if you can make a deal with the Government. Wait until you get

there, cooperate and see what happens in the end" (*Id*.). On the same date that Perez visited with Londono and gave him advice regarding his case, he also met with client Fabio Ochoa (*Id*.).

18. Ochoa had hired Joaquin Perez to represent him, and Perez acknowledges that he discussed a $30 million deal for Ochoa's surrender with a government informant in his capacity as Ochoa's attorney (DE 987 at 60; DE 988- 989: #32, p. 17). On January 20, 2000, Perez went to Colombia and met with the Movant's brother, Jorge Ochoa, for the purpose of discussing Movant's case. This meeting was recorded by Jorge Ochoa. Perez stated that he had spoken to Baruch Vega about cutting a $30 million deal for the Movant (DE987 at 60; DE 988-989: #32, p. 17). On January 29, 2000, Perez again met with Jorge Ochoa at the Colombian ranch of Perez's other client, Nicolas Bergonzoli. Perez had represented Bergonzoli since approximately 1998. This meeting was recorded by Jorge Ochoa. Nicolas Bergonzoli tried to convince Jorge Ochoa to pay the money and told Jorge Ochoa in Perez' presence that he had participated in the program and spent a great deal of money to buy his deal from the government (DE 987 at 62-63; DE 988-989: #33, p.17). Significantly, in those recordings, Bergonzoli and others recognized that Movant was actually innocent.

19. Perez also met with AUSA Theresa Van Vliet on at least two occasions to discuss Movant's case in his capacity as Ochoa's retained attorney (DE1141 at 30). He advocated for a "global plea agreement" for his client, Ochoa, and tried to negotiate a waiver of extradition (DE 1141 at 28, 30). Van Vliet, in her discussions with Perez believed him to be Ochoa's lawyer and treated him as such (DE 1141 at 48). Furthermore, Perez has acknowledged that he represented Ochoa at the time (DE1087 at 6, n.4 and 8). Therefore, there is no doubt that Perez functioned simultaneously as Ochoa and Londono's attorney.

20. Perez' conflict of interest prejudiced the Movant in this case because Perez labored under an "actual" conflict of interest that carried very real and negative consequences for Ochoa. . . .

21. The Eleventh Circuit decision in *Ruffin v. Kemp*, 767 F.2d 748 (11th Cir. 1985) is directly applicable to the instant case. In *Ruffin*, the attorney had approached the government regarding a plea bargain for one co-defendant which involved testimony against the other co-defendant he represented. *Id*. at 749 - 750. This plea bargain never came to fruition. *Id*. at 750. Nonetheless,

14

the court found that the attorney's behavior amounted to an actual conflict of interest which resulted in an adverse impact on the attorney's performance and reversed the conviction. *Id*. at 752. In so doing, the court contemplated that it might be argued that the defendant should have to show that the prosecutor would have been agreeable to a plea bargain on his behalf had his attorney negotiated for it. *Id*. However, the court discarded this argument noting that this would amount to a requirement that actual prejudice be shown, which is not required. *Id*.

22. Similarly, in *Baty v. Balkcom*, 661 F.2d 391 (5th Cir. 1981), a case relied on by the Eleventh Circuit in *Ruffin*, the attorney represented two co-defendants pre-trial. *Id*. at 392-393. During pretrial proceedings, while the single attorney represented both of the co-defendants, the government offered to enter into a plea agreement. *Id*. at 397. The court held that the "conflict of interest before trial alone would be sufficient to grant ... [the] habeas petition" because "[h]ad he not been facing a conflict of interest, . . . [the attorney] might have been able to negotiate a plea agreement on . . . [one defendant's] behalf in return for becoming a prosecution witness against . . . [the other defendant]." *Ruffin* at 750 -751 (quoting *Baty* at 397).

23. In the instant case, Perez never attempted to negotiate a plea agreement for Ochoa which did not involve a massive payment of millions of dollars to government informant Baruch Vega. This enormous price tag was unreasonable and inappropriate as a condition to plea negotiations. Notably, there is no indication that Perez communicated a similar offer to Londono or that Londono was ever required to pay such an exorbitant amount of money. Perez's version of engaging in "plea negotiations" for Ochoa was a futile exercise which did not qualify as plea negotiations at all. In fact, this "program" consisting of promising defendants lower sentences in exchange for millions of dollars (in this case over $30 million) was expressly disapproved of by AUSA Theresa Van Vliet: I had become aware that there were allegations that Mr. Vega was basically running a scam, if you will, on narcotics traffickers and saying to them, well, if you pay me X amount of money I can guarantee you either lighter sentences or lesser charges, whatever. And that we wanted to guard against that in our case. DE 1141: 21. Thus, Perez was never truly negotiating for Ochoa as there was never a "meeting of the minds" between Ochoa and Van Vliet, who expressly disapproved of Baruch Vega's "scam."

DE:10:113-125.

16. The crux of the government's opposing position is:

> Ochoa's argument breaks down completely because three attorneys, Quinon, Black and Srebnick, did, in fact, engage in plea negotiations with the government on behalf of Ochoa (Exhibit 2 – Affidavit of AUSA Edward Ryan). These negotiations did not result in a plea agreement with prosecutors because Ochoa maintained his innocence and instead chose to go to trial. *Id.*

DE:169:17. But, contrary to the government, what Ochoa maintained was his right not to be extorted and retaliated against due to having his right to conflict-free counsel violated amid an uncontrolled flurry of illicit offers to defendants in Operation Millenium. The government may dispute the level of prejudice, but under the standard set by the Supreme Court any amount of additional jail time unwarrantedly incurred due to ineffective assistance constitutes prejudice. The dramatic shift in leverage and plea discussions arising from Ochoa's revelation of the conflict of counsel shows that he was prejudiced by the conflict in this case in a way that was not cured by later elevated-sentence plea offers. The claims asserted have factual and logical support and warrant the grant of discovery and an evidentiary hearing.

WHEREFORE, movant Fabio Ochoa-Vasquez requests that the Court grant his request for an evidentiary hearing and grant limited discovery, including discovery of all communications by the government concerning potential plea offers to the movant and regarding the role played by Perez in relation to the Vega payment-for-cooperation plan.

Respectfully submitted,

/s/  *Richard C. Klugh*
Richard C. Klugh, Esq.
Fla. Bar No. 305294
Attorney for Movant
Ingraham Building
25 S.E. 2nd Avenue, Suite 1100
Miami, Florida 33131
Tel. (305) 536-1191
Fax (305) 536-2170
E-Mail  rickklu@aol.com

## CERTIFICATE OF SERVICE

I HEREBY certify that on   October 14, 2014  , I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/  *Richard C. Klugh*
Richard C. Klugh, Esq.